USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/29/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NAACP Legal Defense & Education Fund, Inc.,

Plaintiff,

–v–

Department of Justice,

Defendant.

18-cv-9363 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Plaintiff NAACP Legal Defense & Education Fund, Inc. ("LDF") brought this Freedom of Information Act ("FOIA") action claiming, in relevant part, that the Department of Justice ("DOJ") failed to conduct an adequate search in response to its FOIA request for documents related to the proposed inclusion of a citizenship status question on the 2020 decennial census. Now before the Court are the parties' cross-motions for summary judgment on the narrow and limited question of the adequacy of DOJ's search for documents responsive to LDF's FOIA request. For the reasons that follow, the Court DENIES DOJ's motion and GRANTS LDF's cross-motion. The Court concludes that LDF has established on this record the inadequacy of DOJ's search, which was facially under-inclusive and unduly restrictive. As a remedy, the parties are required to meet and confer on agreed-upon search terms for DOJ to use in conducting a further search that is reasonably calculated to discover the requested documents.

I.    BACKGROUND

The undisputed facts set out in this Opinion and Order are drawn from the parties' submissions, including the agency declarations submitted by DOJ, which are afforded a presumption of good faith for purposes of these summary judgment motions. *See Carney v. U.S.*

*Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994).[1]  The Court also considers supplemental submissions filed by the parties in October and December 2019 and January and February 2020. *See* Dkt. Nos. 30, 33–36.

On March 26, 2018, Wilbur Ross, the Secretary of the Department of Commerce, issued a memorandum outlining his decision to reinstate a citizenship status question on the 2020 decennial census.  *See generally* Dkt. No. 23-3.  In it, he stated that the decision to do so was informed by a December 12, 2017 letter request from Arthur Gary, General Counsel of DOJ's Justice Management Division.  *See id.*  The Gary letter requested that the Census Bureau reinstate a citizenship status question on the 2020 decennial census, asserting that citizenship data "is critical to [DOJ's] enforcement of Section 2 of the Voting Rights Act and its important protections against racial discrimination in voting."  Dkt. No. 23-1 at 1.  The Department of Commerce's decision—and the DOJ justification on which it was based—prompted multiple federal lawsuits and FOIA requests.  Plaintiff LDF, believing DOJ's rationale to be pretextual and "seeking much-needed transparency about this issue of utmost public importance," Dkt. No. 26 at 3, submitted one such FOIA request to DOJ's Civil Rights Division and Office of Legal Policy on April 11, 2018.  Below, the Court summarizes LDF's request and DOJ's response.[2]

---

[1] Because LDF's Rule 56.1 statement refers only to undisputed facts that are established elsewhere in the record, the Court need not consider DOJ's argument that it disregard LDF's Rule 56.1 statement.  *See* Dkt. No. 27 at 14.

[2] Because LDF is no longer pursuing its claims as they relate to requests made of the Office of Legal Policy, *see* Dkt. No. 26 at 4 n.6, this Opinion and Order discusses DOJ's response with respect to requests made of the Civil Rights Division only.

A.      **The FOIA Request**

LDF's April 11 FOIA request seeks records relating to DOJ's role in the Department of

Commerce's decision to add a citizenship status question to the 2020 decennial census.  *See* Dkt.

No. 1-1.  In particular, the request seeks copies of five separate categories of documents:[3]

1) All documents, including but not limited to draft and final memoranda, opinions, analyses, or correspondence, relating to the U.S. Department of Justice's review of whether a citizenship status question on the 2020 decennial U.S. Census is necessary to enforce Section 2 of the Voting Rights Act and/or how adding a citizenship question will improve protections for minority voting rights.

2) All documents, including but not limited to draft and final memoranda, opinions, analyses, or correspondence, relating to the U.S. Department of Justice's request for a citizenship status question on the 2020 decennial U.S. Census as necessary to enforce Section 2 of the Voting Rights Act.

3) All documents, including but not limited to draft and final memoranda, opinions, analyses, or correspondence, relating to the Department's review of whether a citizenship status question on the American Community Survey (ACS) is "insufficient in scope, detail, and certainty" to enforce Section 2 of the Voting Rights Act.

4) All documents, including but not limited to draft and final memoranda, opinions, analyses, or correspondence, relating to the Department's review of whether a citizenship status question on the 2020 decennial U.S. Census will have an impact on the response rate of Black or African American people on the 2020 decennial U.S. Census count.

5) All documents, including but not limited to draft and final memoranda, opinions, analyses, or correspondence, relating to the Department's review of whether a citizenship status question on the 2020 decennial U.S. Census will have an impact on the response rate of non-Black or non-African American racial or ethnic groups on the 2020 decennial U.S. Census count.

---

[3] The request specifies that "[t]he term 'document' is to be interpreted in the broadest possible sense within the meaning of the Freedom of Information Act and shall include, without limitation, any written, printed, typed, spoken, computerized, or other graphic, phonic, or recorded matter of any kind or nature, however produced or reproduced, whether sent or received or neither, including drafts and copies bearing notations or marks not found on the original."  Dkt. No. 1-1 at 1 n.1.

*Id.* at 1–2 (footnotes omitted).  The Civil Rights Division confirmed receipt of LDF's FOIA

request on April 25, 2018.  Dkt. No. 24 ¶ 4.

### B.    DOJ's Response

Because the limited issue before the Court is the adequacy of the search conducted by

DOJ, it is necessary to recount with some detail the specific nature of the search.  Pursuant to its

routine procedures, when the Civil Rights Division receives a request seeking specific

documents such as the one at issue here, it contacts the Section that specializes in the

enforcement of the particular statute or issues referenced in the request—in this case, the Voting

Section.  *Id.* ¶¶ 5–6.  It also contacts either the Office of the Assistant Attorney General, which

has senior management authority of the Civil Rights Division's twelve sections, or the Deputy

Assistant Attorney General with supervisory authority over the relevant Section or information

relevant to the subject matter of the request.  *Id.* ¶ 7.  In this case, the request was referred to the

Office of the Assistant Attorney General, which identified John M. Gore, the Deputy Assistant

Attorney General responsible for reviewing the Voting Section,[4] as the only Office of the

Assistant Attorney General employee likely to have records responsive to LDF's request.  *Id.*

¶ 13.

The Civil Rights Division had previously received other requests similar to subpart (2) of

LDF's FOIA request, which it interpreted as seeking only records "relating to DOJ's decision to

send the Gary Letter, including the process of drafting and sending the Gary Letter, and DOJ's

decisionmaking process."  *Id.* ¶ 8.  In conducting searches for records responsive to these earlier

requests, Chris Herren, Chief of the Voting Section, Rebecca J. Wertz, the Principal Deputy

Chief, and Robert S. Berman, a Deputy Chief and FOIA contact in the Section, determined that

---

[4] Gore was also the Acting Assistant Attorney General for Civil Rights from late July 2017 to early November 2018.
Dkt. No. 24 ¶ 13.

Herren was the only person in the Voting Section likely to be in possession of responsive records because he was the only person who had communicated with the Office of the Assistant Attorney General and Gore regarding the Gary Letter. *Id.* ¶ 11. Herren searched his email account for emails with the Office of the Assistant Attorney General and Gore related to the Gary letter and identified responsive email chains between he and Gore. *Id.* ¶ 11. This search was completed by January 2018, *id.* ¶ 11, and responsive documents were forwarded to DOJ's Freedom of Information/Privacy Act Branch on February 12, 2018, *id.* ¶¶ 11–12. The Voting Section subsequently advised the Freedom of Information/Privacy Act Branch that the documents sent on February 12, 2018 were identical to the responsive records located with respect to subpart 2 of LDF's request. *Id.* ¶ 12. The Office of the Assistant Attorney General also conducted searches for the earlier FOIA requests similar to subpart (2) of LDF's request, searching Gore's email for the term "census" on February 15, 2018. *Id.* ¶ 13–14. This search turned up responsive records, which were also forwarded to the Freedom of Information/Privacy Act Branch. *Id.* ¶ 14. In addition to relying on prior searches to identify records responsive to subpart (2) of LDF's request, the Civil Rights Division undertook additional searches to identify records responsive to subparts (1), (3), (4), and (5). *Id.* ¶ 17.

On May 31, 2018, the Civil Rights Division issued a response to LDF, informing it that "all responsive records were exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(A) since disclosure thereof could reasonably be expected to interfere with law enforcement proceedings regarding the review of this issue by the Civil Rights Division's Voting Section." Dkt. No. 24-3 at 1–2. On August 28, 2018, LDF administratively appealed the sufficiency of the May 31 response withholding all responsive documents, *see* Dkt. No. 26-2, and on September 27, 2018,

the Civil Rights Division's response was affirmed, *see* Dkt. No. 26-3.  Following the denial of its

appeal, LDF initiated this action on October 12, 2018.  *See* Dkt. No. 1.

The Civil Rights Division then conducted several supplemental searches and provided

LDF with four additional responses.  The first of these supplemental searches, which took place

on July 3, 2018, consisted of an additional electronic search of Gore's email account for the

period January 23, 2017 to July 3, 2018, again using the search term "census."  Dkt. No. 24 ¶ 15.

The Civil Rights Division also separately searched for emails for which Arthur Gary or Bethany

Pickett, Counsel to the Assistant Attorney General, were addressees.  *Id.*  These searches were

intended to identify any additional documents responsive to subpart (2) of LDF's request.

Ultimately, approximately 25 emails between Gore and other DOJ employees were identified

that related to the Gary Letter.  *Id.*  These documents, which were largely duplicative of

documents identified in the initial searches, were forwarded to the Freedom of

Information/Privacy Act Branch.  *Id.*

A second supplemental search was conducted on August 2, 2018 to identify hard copy

documents responsive to subpart (2) of LDF's request, again for the period January 23, 2017 to

August 2, 2018.  *Id.* ¶ 16.  Gore, Herren, Pickett, and Ben Aguiñaga, Gore's Chief of Staff, were

identified as individuals likely to have responsive hard copy records.  *Id.*  Of these individuals,

only Gore indicated that he had responsive hard copy documents, of which he ultimately turned

over 114 pages.  *Id.*  These same custodians also conducted a search for ESI responsive to

subpart (2) of LDF's request but did not identify any additional documents.  Dkt. No. 28 ¶ 7.

On November 16, 2018, the Civil Rights Division issued a supplemental response to

LDF, releasing 78 pages of documents in full or in part and withholding an additional 42 pages.

*See* Dkt. No. 24-4.  Following the Civil Rights Division's release of these pages, it conducted a

third supplemental search to identify additional documents responsive to subparts (1), (3), (4), and (5) of LDF's request. This search consisted of providing Herren, Wertz, and Berman—personnel with "knowledge of the portfolios of all Voting Section employees"—LDF's FOIA request and asking them if additional documents responsive to these subparts were likely to exist in the Voting Section. Dkt. No. 24 ¶ 18; Dkt. No. 28 ¶ 8. They concluded that no such additional responsive documents were likely to exist. Gore was also provided with LDF's FOIA request and indicated that he did not have additional documents responsive to these subparts. Dkt. No. 24 ¶ 18; Dkt. No. 28 ¶ 8.

On February 14, 2019, the Civil Rights Division issued a second supplemental response indicating that it located no documents responsive to subparts (1), (3), (4), and (5) of LDF's request. Dkt. No. 24 ¶ 26; *see also* Dkt. No. 24-6. A month later, on March 15, 2019, it issued a third supplemental response, releasing 97 pages in full and withholding 17 pages in full. Dkt. No. 24 ¶ 27; *see also* Dkt. No. 24-7. This response released pages from the hard copy documents that Gore turned over in August 2018 but were mistakenly omitted from earlier responses. Dkt. No. 24 ¶ 27.

A third and final supplemental search was then conducted, though DOJ does not indicate when. *Id.* ¶ 20. This search was prompted by DOJ's discovery of three additional responsive documents during the course of this litigation. *Id.* For its final supplemental search, the Civil Rights Division searched the census collection database that was created during the substantive litigation concerning the 2020 decennial census. *Id.* ¶¶ 20, 22. This database is composed of electronic and hard copy documents from Gore, Herren, Pickett, and Aguiñaga; documents collected in response to FOIA requests regarding the 2020 decennial census and the citizenship status question, the Gary letter, and Kris Kobach and the White House Commission on Election

Integrity; and 13 expert witness reports relating to Section 2 of the Voting Rights Act provided

by the Voting Section. *Id.* ¶¶ 20–21. The Civil Rights Division searched this database for

records associated with Gore, Herren, Pickett, and Aguiñaga that included the term "census" in

order to "compile the largest possible data collection to locate all documents responsive to

[LDF's] request." *Id.* ¶ 22. A separate search was also run for the term "citizenship question."

*Id.* Ultimately, these searches of the census collection database did not identify any additional

responsive documents not already identified. *Id.*

On May 9, 2019, the Civil Rights Division issued its fourth and final supplemental

response, releasing three pages in part or in full and withholding four. *Id.* ¶ 28; *see also* Dkt. No.

24-9. These pages comprised the three additional responsive documents discussed above. In

total, in response to LDF's request, DOJ has release 178 pages in full or in part and withheld 63

pages in full.

### C.    Litigation

On October 12, 2018, LDF commenced this action pursuant to 5 U.S.C. § 552(a)(4)(B),

claiming that DOJ (1) failed to conduct adequate searches for responsive records; (2) wrongfully

withheld non-exempt responsive records; and (3) failed to provide LDF with a determination as

to whether it would comply with LDF's request within 30 days of receiving it, as required by 5

U.S.C. § 552(a)(6). Dkt. No. 1 ¶¶ 43–62.

At the initial pretrial conference in this matter, the Court adopted the parties' briefing

schedule for cross-motions for summary judgment. *See* Dkt. No. 19. DOJ filed its motion for

summary judgment with respect to LDF's first and second claims on May 13, 2019, *see* Dkt. No.

23, and LDF filed its cross-motion for summary judgment on June 10, 2019, *see* Dkt. No. 25.

Because LDF does not contest DOJ's assertion that "the only disputed issue regarding [the Civil

Rights Division's] response is the adequacy of [its] search for responsive records," Dkt. No. 27

at 1—and indeed only seeks summary judgment on its adequacy of search claim—the Court

deems its other claims abandoned and dismisses them.[5]   Accordingly, it considers each party's

summary judgment motion with respect to LDF's first claim only.

## II.   LEGAL STANDARD

The Freedom of Information Act "was enacted to promote honest and open government

and to assure the existence of an informed citizenry 'to hold the governors accountable to the

governed.'"  *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (quoting *Ethyl*

*Corp. v. EPA*, 25 F.3d 1241, 1245 (4th Cir. 1994)).   It entitles members of the public "to have

access to any record maintained by a federal agency, unless that record is exempt from

disclosure."  *A. Michael's Piano, Inc. v. FTC*, 18 F.3d 138, 143 (2d Cir. 1994).

"Summary judgment is the procedural vehicle by which most FOIA actions are

resolved."  *Seife v. United States Dep't of State*, 298 F. Supp. 3d 592, 604 (S.D.N.Y. 2018)

(citation omitted).  As a general matter, a court may not grant summary judgment unless the

parties' submissions, taken together, show that "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In order

to prevail on a motion for summary judgment in a FOIA case, the defending agency has the

burden of showing that its search was adequate and that any withheld documents fall within an

exemption to the FOIA."  *Carney*, 19 F.3d at 812.  Because LDF no longer challenges the

withholding of any documents responsive to its request, the Court considers only whether DOJ

has met its "burden of showing that its search was adequate."  *Id.*  In a FOIA case, "[a]ffidavits

or declarations supplying facts indicating that the agency has conducted a thorough search,"

---

[5] LDF has reiterated in recent filings that "the sole remaining issue in this litigation" is the "adequacy of DOJ's
search for records in [the Civil Rights Division] responsive to LDF's request."  Dkt. No. 35.

which are "accorded a presumption of good faith" by courts, are sufficient to sustain this burden. *Id.* (quoting *Safecard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)).  Accordingly, where agency submissions are "adequate on their face[s]," a district court may award summary judgment in the agency's favor on the basis of its affidavits alone.  *Id.*

Conversely, summary judgment in the agency's favor is inappropriate "where the agency's response raises serious doubts as to the completeness of the agency's search, where the agency's response is patently incomplete, or where the agency's response is for some other reason unsatisfactory."  *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*, 877 F. Supp. 2d 87, 96 (S.D.N.Y. 2012) (quoting *Exxon Corp. v. Federal Trade Comm'n*, 466 F. Supp. 1088, 1094 (D.D.C. 1978)).  "A district court that finds a search to be inadequate may direct the defendant to conduct additional searches."  *Immigrant Def. Project v. United States Immigration*, 208 F. Supp. 3d 520, 527 (S.D.N.Y. 2016) (citing *Nat'l Day Laborer Org. Network*, 877 F. Supp. 2d at 112).

## III.    DISCUSSION

"[W]hen a plaintiff questions the adequacy of the search an agency made in order to satisfy its FOIA request, the factual question it raises is whether the search was reasonably calculated to discover the requested documents."  *Grand Cent. P'ship*, 166 F.3d at 489 (quoting *SafeCard*, 926 F.2d at 120); *see also Garcia v. U.S. Dep't of Justice, Office of Info. and Privacy*, 181 F.Supp.2d 356, 366 (S.D.N.Y. 2002) ("[A]gency affidavits must show that the agency made a good faith effort to search for the requested documents, using methods 'reasonably calculated' to produce documents responsive to the FOIA request." (quoting *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984))).  "The adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to

carry out the search." *Nat'l Day Laborer Org. Network*, 877 F. Supp. 2d at 96 (quoting *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 316 (D.C. Cir. 2003)).  In other words, the adequacy of a search is judged against a reasonableness standard: "an agency's search need not be perfect, but rather need only be reasonable." *Grand Cent. P'ship*, 166 F.3d at 489 (citing *SafeCard,* 926 F.2d at 1201).

Under Second Circuit law, "to establish the adequacy of a search, agency affidavits must be . . . 'relatively detailed and nonconclusory.'" *Id.* (quoting *SafeCard,* 926 F.2d at 1200).  A "satisfactory agency affidavit should, at a minimum, describe in reasonable detail the scope and method by which the search was conducted." *Amnesty Int'l USA v. C.I.A.*, 2008 WL 2519908, at *8 (S.D.N.Y. June 19, 2008) (quoting *Maynard v. CIA,* 986 F.2d 547, 559–60 (1st Cir. 1993)); *see also Iturralde*, 315 F.3d at 313–14 ("[T]he agency may meet its burden by providing 'a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials . . . were searched.'" (quoting *Oglesby v. United States Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990))).  If a court makes a threshold determination that an agency affidavit is sufficiently specific, it then proceeds to consider whether the underlying search was reasonable.  *See Immigrant Def. Project*, 208 F. Supp. 3d at 526 ("[T]he declarations—together with their supplements—are sufficiently specific for the Court to judge the reasonableness of the underlying search.").

To satisfy the reasonableness standard articulated above, "an agency must search all locations likely to contain responsive records; not simply where the records are 'most likely' to be found." *Knight First Amendment Inst. at Columbia Univ. v. U.S. Dep't of Homeland Sec.*, 407 F. Supp. 3d 311, 324 (S.D.N.Y. 2019); *see also DiBacco v. U.S. Army*, 795 F.3d 178, 190 (D.C. Cir. 2015).  In applying this reasonableness standard, courts consider, among other things,

"the search terms and type of search performed" and the "nature of the records system or database searched." *See Knight First Amendment Inst.*, 407 F. Supp. 3d at 324; *see also Schwartz v. Dep't of Def.*, 2017 WL 78482, at *6 (E.D.N.Y. Jan. 6, 2017).

Search terms must "be reasonably tailored to uncover documents responsive to a FOIA request." *Brennan Ctr. for Justice at New York Univ. Sch. of Law v. U.S. Dep't of Justice*, 377 F. Supp. 3d 428, 434 (S.D.N.Y. 2019).  It is within the discretion of federal agencies to develop search terms reasonably tailored to respond to the FOIA request at hand. *Id.*  Indeed, generally FOIA petitioners "cannot dictate the search terms to be used." *Id.*; *see also Bigwood v. United States Dep't of Def.*, 132 F.Supp.3d 124, 140 (D.D.C. 2015).  However, an agency must provide "logical explanations" for decisions it makes with respect to the search terms it does or does not use. *Immigrant Def. Project*, 208 F. Supp. 3d at 527 (citing *Fox News Network, LLC v. U.S. Dep't of Treasury*, 739 F. Supp. 2d 515, 535 (S.D.N.Y. 2010)).  Indeed, "[c]ourts in this District have found that agencies fulfilled their obligation under FOIA even where the agency failed to search certain terms listed in a FOIA request or emphasized by a plaintiff, so long as the agency provided an explanation as to why the search term was not used (such as, the futility of the term to narrow the field of documents or an office's failure to use the term in question in its records or recordkeeping)." *Id.*

"FOIA does not demand a search that would be futile." *Amnesty Int'l USA*, 2008 WL 2519908, at *11 (citing *Am.-Arab Anti-Discrimination Comm. v. U.S. Dep't of Homeland Sec.*, 516 F.Supp.2d 83, 87–88 (D.D.C. 2007)).  Nor does it require that government agencies act as "full-time investigators on behalf of requestors."  *Seife*, 298 F. Supp. 3d at 611 (S.D.N.Y. 2018) (quoting *Freedom Watch, Inc. v. Cent. Intelligence Agency*, 895 F. Supp. 2d 221, 228 (D.D.C. 2012)).  Accordingly, an agency need not "respond to a request that is 'so broad as to impose an

unreasonable burden upon the agency,' such as one which 'require[s] the agency to locate, review, redact, and arrange for inspection a vast quantity of material.'" *Id.* at 611 (quoting *Nat'l Day Laborer Org. Network v. United States Immigration & Customs Enf't*, 2017 WL 1494513, at *11 (S.D.N.Y. Apr. 19, 2017)). However, the agency itself "bears the burden to 'provide [a] sufficient explanation as to why a search [in response to a FOIA request] would be unreasonably burdensome.'" *Ayuda, Inc. v. Fed. Trade Comm.*, 70 F. Supp. 3d 247, 275 (D.D.C. 2014) (alteration in original) (quoting *Nation Magazine, Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 892 (D.C. Cir. 1995)).

## A.     DOJ'S SEARCH WAS NOT ADEQUATE

As an initial matter, DOJ's declarations, taken together, are sufficiently specific to allow the Court to judge the reasonableness of the underlying searches. Indeed, they are "nonconclusory," *Grand Cent. P'ship, Inc.*, 166 F.3d at 488–89, and describe "in reasonable detail the scope and method by which the search[es were] conducted," *Amnesty Int'l USA*, 2008 WL 2519908, at *8; *see generally* Dkt. No. 24; Dkt. No. 28. Having made this threshold determination, the Court proceeds to consider whether the underlying searches set forth in the agency declarations were reasonable. LDF argues that the underlying searches were unreasonable and thus inadequate. The Court agrees for the reasons set forth below and thus grants LDF's cross-motion for summary judgment.

### 1.     Searches for Documents Responsive to Subpart (2) were Inadequate

DOJ's declarations detail various searches conducted to locate records responsive to subpart (2) of LDF's FOIA request. The Court focuses its analysis on the last of these searches—the search of the census collection database—which is the search to which LDF primarily objects. As an initial matter, for the reasons articulated below, the Court concludes

that the census collection database was a location likely to contain records responsive to subpart
(2) of LDF's FOIA request.  *See infra* Section III.A.2.  As a result, DOJ was obligated under
FOIA to search it.  *See DiBacco*, 795 F.3d at 190.  In assessing whether the Civil Rights
Division's search of the census collection database was reasonable, the Court considers the
search terms used and the nature of the database, *see Knight First Amendment Inst.*, 407 F. Supp.
3d at 324, to determine whether "the search was reasonably calculated to discover the requested
documents," *Grand Cent. P'ship*, 166 F.3d at 489.

Applying the reasonableness standard articulated above, the Court concludes that the
electronic search of the census collection database was inadequate with respect to subpart (2) of
LDF's request because the search terms used "were too restrictive to be reasonably calculated to
uncover all responsive records."  *See Knight First Amendment Inst.*, 407 F. Supp. 3d at 325.  In
response to this subpart of LDF's request, which requests documents relating to DOJ's request
for a citizenship status question on the 2020 decennial census as necessary to enforce Section 2
of the Voting Rights Act, the Civil Rights Division first searched the census collection database
using only the search term "census."  Dkt. No. 24 ¶ 22.  While DOJ has discretion to develop
search terms reasonably tailored to subpart (2) of LDF's request, *see Brennan Ctr. for Justice*,
377 F. Supp. 3d at 434, its explanation for why it used *only* this search term to search for records
responsive to this subpart is illogical and thus insufficient, *see Immigrant Def. Project*, 208 F.
Supp. 3d at 527.  It alleges only that it used the term "census" "to compile the largest possible
data collection to locate all documents responsive to [subpart (2) of LDF's] request."  Dkt. No.
24 ¶ 22.  But it does not further *explain* why or how use of only this term would succeed in
compiling the "largest possible data collection" of documents potentially responsive to subpart
(2) of LDF's request.  Nor does it account for the fact that a search for the term "census" *leaves*

*out* all of the documents responsive to this subpart of LDF's request that discuss the citizenship status question as necessary to enforce Section 2 of the Voting Rights Act but do not explicitly mention the word "census."  That such documents exist is confirmed by LDF's citation to a publicly available document ostensibly responsive to subpart (2) of its request that does *not* include the term census (or citizenship question).  *See* Dkt. No. 26 at 22 n.54.  While DOJ is right that the "failure of an agency to turn up one specific document in its search does not alone render a search inadequate," *Iturralde*, 315 F.3d at 315, "[e]vidence that relevant records have not been released may shed light on whether the agency's search was indeed inadequate."  *Nat'l Day Laborer Org. Network*, 877 F. Supp. 2d at 96 (quoting *Weisberg,* 705 F.2d at 1351).  In this case, the existence of a potentially responsive document that does not contain the primary search term utilized by the Civil Rights Division—and the possible existence of others—underscores the "underinclusive and unduly restrictive" nature of DOJ's primary search term.  *See Knight First Amendment Inst.*, 407 F. Supp. 3d at 325 ("[T]he Office of the Director's search using the phrases 'endorse provision' and 'espouse provision' are underinclusive and unduly restrictive. The search leaves out, for example, records discussing the exclusion or removal of an individual who purportedly endorsed or espoused terrorist activity but did not explicitly mention the 'endorse provision' or 'espouse provision.'").

Furthermore, the fact that DOJ subsequently conducted a second search of the census collection database using the search term "citizenship question" does not render its inadequate search adequate.  Dkt. No. 24 ¶ 22.  Indeed, even the combination of searches for these two search terms is "too restrictive to be reasonably calculated to uncover" records responsive to subpart (2) of LDF's request, because even that combination remains "unreasonably narrow" given the breadth of the request.  *See Knight First Amendment Inst.*, 407 F. Supp. 3d at 325

(finding a search for two search terms "unreasonably narrow given the breadth of Plaintiff's request"); *Brennan Ctr. for Justice*, 377 F. Supp. 3d at 434 (finding agencies' respective uses of three and four search terms inadequate where they failed to employ other obvious search terms). As above, a search for the term "citizenship question" leaves out all of the documents that may be responsive to subpart (2) of LDF's request but do not explicitly mention the phrase "citizenship question."  Searches using only underinclusive "shorthand phrases" such as this one have been found to be unduly restrictive—and thus inadequate—for this reason. *See Knight First Amendment Inst.*, 407 F. Supp. 3d at 325.

Accordingly, in the absence of a logical explanation for the search terms it used, the Court concludes that DOJ's search of the census collection database to locate records responsive to subpart (2) of LDF's request was inadequate, because such a search was not "reasonably calculated to discover the requested documents."  *Grand Cent. P'ship*, 166 F.3d at 489.

DOJ argues that its search was not inadequate because searching the census collection database using additional search terms, such as those suggested by LDF, would be unreasonably burdensome.  It further argues that LDF's motion is subterfuge for impermissibly dictating the search terms of its own FOIA request.  *See* Dkt. No. 27 at 7–9.  The Court considers and rejects both counterarguments below.

With respect to its first counterargument, DOJ fails to bear its burden to "provide [a] sufficient explanation as to why a search [in response to subpart (2) of LDF's FOIA request] would be unreasonably burdensome."  *Ayuda, Inc.*, 70 F. Supp. 3d at 275 (quoting *Nation Magazine*, 71 F.3d at 892).  It argues only that because the database contains documents unrelated to subpart (2) of LDF's request, searching it using "broader terms" such as "citizenship" or "Section 2" would be "extremely likely to capture a large number of records

16

relating to voting issues but not responsive for records relating to Plaintiff's request." Dkt. No. 24 ¶ 22; *see also* Dkt. No. 28 ¶ 5 ("[LDF's] suggested terms are too general and could potentially encompass a great many records unrelated to the 2020 Census and the December 12, 2017 letter or the effect of adding a citizenship question on minority populations"). Such a speculative and cursory explanation is insufficient on its face to satisfy DOJ's burden because it fails to "describe with reasonable specificity the actual burden imposed" by the request. *See Seife*, 298 F. Supp. 3d at 612 (finding insufficient an explanation that provided no information with respect to the volume of, the level of difficulty of, or amount of time such a search would require).

Moreover, DOJ's burden argument is belied by the nature of the database, which the Court also considers in determining the reasonableness of a search. Electronic databases may be searched using a few keystrokes, and searches can be refined by combining search terms using Boolean operators. *See Nat'l Day Laborer Org. Network*, 877 F. Supp. 2d at 106. DOJ is undoubtedly capable of creating and executing such targeted searches because it used Boolean operators in collecting documents to populate the census collection database. *See* Dkt. No. 24 ¶ 20 (listing search terms used to collect records for database, including "citizenship and DOC" and "citizenship and ACS," among others). Furthermore, as LDF points out, searches of the census collection database could be further constrained by limiting them to the custodians DOJ has already identified as likely to have records responsive to this subpart of LDF's request. *See* Dkt. No. 29 at 13. In light of the cursory nature of its explanation and the methods available to it to craft targeted and refined searches responsive to subpart (2) of LDF's FOIA request, the Court concludes that DOJ has failed to sufficiently explain why using additional search terms would be unduly burdensome.

DOJ also misconstrues LDF's motion as a backhanded attempt to dictate the search terms

of its own FOIA request.  However, LDF's motion makes clear that the search terms it

references, which are drawn from the language of the FOIA request itself, are *suggestions* as to

how DOJ might craft a search that is "reasonably tailored to uncover documents responsive to

[its] FOIA request." *Brennan Ctr. for Justice*, 377 F. Supp. 3d at 434; *see, e.g.*, Dkt. No. 26 at

10 (describing "suggested" search terms responsive to subpart (2) of its request).  It is not

improper of LDF to suggest search terms it believes may assist DOJ in crafting an adequate

search of the census collection database.  Indeed, it is not uncommon for parties to work together

in deciding on new search times, as courts in this District sometimes require when the initial

search was inadequate.  *See, e.g.*, *Knight First Amendment Inst.*, 407 F. Supp. 3d at 326 ("ICE

must conduct new searches.  The parties should meet and confer and submit a joint status report

regarding the new search terms."); *Nat'l Day Laborer Org. Network*, 877 F. Supp. 2d at 111

("The parties will need to agree on search terms and protocols.").

Because DOJ has failed to establish the adequacy of its search for records responsive to

subpart (2) of LDF's request, it must conduct a new search.  The Court will follow the practice of

other courts in this District and require the parties to collaborate to craft new search terms.

Accordingly, the parties must meet and confer and submit a joint status letter regarding new

search terms responsive to subpart (2) of LDF's request within twenty-one days of the date of

this Opinion and Order.

### 2. Searches for Documents Responsive to Subparts (1), (3), (4), and (5) were Inadequate

DOJ's declarations also describe searches conducted to locate records responsive to

subparts (1), (3), (4), and (5) of LDF's FOIA request.  In assessing whether these searches were

reasonable, the Court first considers whether the agency searched "all locations likely to contain

responsive records." *Knight First Amendment Inst.*, 407 F. Supp. 3d at 324.  An "agency's

decisions about which offices or databases to search . . . must . . . be 'reasonably calculated to

uncover all relevant documents.'" *Amnesty Int'l USA*, 2008 WL 2519908, at *9 (quoting

*Oglesby*, 920 F.2d at 68).  Indeed, it is "well-settled that if an agency has reason to know that

certain places may contain responsive documents, *it is obligated under FOIA to search barring*

*an undue burden*." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 327 (D.C. Cir. 1999)

(emphasis added).

Because the Court finds that DOJ failed to search all locations likely to contain

responsive records, it concludes that the searches it conducted to locate records responsive to

subparts (1), (3), (4), and (5) of LDF's FOIA request were inadequate.  DOJ's searches for

records responsive to these subparts consisted entirely of the following:  Herren, Wertz, and

Berman were provided with LDF's FOIA request and asked if any additional records responsive

to these subparts existed in the Voting Section.  Dkt. No. 28 ¶ 8.  Gore was also provided with

LDF's FOIA request and asked whether he had any additional records responsive to these

subparts.  *Id.*  The Voting Section custodians concluded that no such additional responsive

records were likely to exist, and Gore indicated that he did not have any additional responsive

records.  *Id.*; *see also* Dkt. No. 24 ¶ 17–18.

However, as LDF points out, DOJ had ample reason to believe that the census collection

database was also likely to contain records responsive to subparts (1), (3), (4), and (5) of LDF's

request.  This database is populated by documents related to the addition of the citizenship status

question to the 2020 decennial census.  Indeed, the database is comprised of documents

responsive to a Rule 45 subpoena issued in the substantive litigation concerning the 2020

decennial census.  *See* Dkt. No. 28-1.  Among other categories, this subpoena requested

documents demonstrating whether DOJ's enforcement of the Voting Rights Act is hindered by the lack of citizenship data and the use or reliance on citizenship data from the American Community Survey for purposes of enforcement of the Voting Rights Act. *Id.* Documents responsive to the requests in this subpoena would, *at a minimum*, also be responsive to subparts (1) and (3) of LDF's FOIA request, and perhaps others. *See supra* Section I.A. Because the database was likely to contain records responsive to the other subparts of LDF's request, DOJ was obligated under FOIA to search it. *See Valencia-Lucena*, 180 F.3d at 327. Its failure to do so renders the searches it did conduct to locate records responsive to these subparts of LDF's request inadequate. *See id.*

DOJ argues that its searches for records responsive to subparts (1), (3), (4), and (5) of LDF's request were not inadequate, and thus it should not be required to search the census collection database for records responsive to them. However, the Court does not find any of its arguments to this effect availing.

It argues first that its searches were not inadequate because FOIA does not create any requirement that agencies conduct electronic searches. On this point, DOJ is correct. However, it is not the failure to conduct electronic searches in and of itself that renders these searches inadequate; rather, as discussed above, it is the failure to search *all* locations—including the census collection database—"likely to contain responsive records." *See Knight First Amendment Inst.*, 407 F. Supp. 3d at 324; *see also DiBacco*, 795 F.3d at 190. In this instance, then, the need to conduct electronic searches is only precipitated by the fact that the location likely to contain responsive records is an electronic database. DOJ further suggests that it did, in effect, conduct electronic searches of the census collection database for records responsive to these subparts of LDF's request. Indeed, it asserts that its search of the census collection database for records

responsive to subpart (2) of LDF's FOIA request was likely to also return "some records responsive to the other subparts of [LDF's] request." *See* Dkt. No. 28 ¶ 7.  However, it fails to provide any logical explanation for why searches for "census" and "citizenship question" would also return records responsive to four separate and distinct subparts of LDF's request.  *See Immigrant Def. Project*, 208 F. Supp. 3d at 527.

Finally, DOJ argues that it would not be reasonable to conduct electronic searches of the census collection database with respect to subparts (1), (3), (4), and (5) of LDF's request because Herren, Wertz, Berman, and Gore already determined that additional documents responsive to these subparts were not likely to exist.  However, the cases DOJ cites in support of this argument serve only to undermine it.  Indeed, these cases stand for the proposition that "an agency is not required to expend its limited resources on searches for which *it is clear at the outset that no search will produce the records sought*."  *See Reyes v. United States Envtl. Prot. Agency*, 991 F. Supp. 2d 20, 27 (D.D.C. 2014) (emphasis added); *see also Cunningham v. U.S. Dep't of Justice*, 40 F. Supp. 3d 71, 83 (D.D.C. 2014), *aff'd*, 2014 WL 5838164 (D.C. Cir. Oct. 21, 2014).  This is so because "FOIA does not demand a search that would be futile."  *Amnesty Int'l USA*, 2008 WL 2519908, at *11.  However, it is far from *clear* that no search of the census collection database will produce records responsive to subparts (1), (3), (4), and (5) of LDF's request—or, in other words, that such a search would be futile.[6]  Indeed, the Court already concluded, for the reasons articulated above, that the census collection database is likely to contain records responsive to

---

[6] Contrary to DOJ's contention, the mere fact that Herren, Wertz, Berman, and Gore made a determination that additional documents responsive to these subparts were unlikely to exist does *not* make it clear at the outset that a search of the census collection database would be futile.  This argument is undermined by the fact that, on at least one prior occasion, Gore—the custodian at the center of this action—was unaware that he possessed additional documents responsive to a similar FOIA request that he had not disclosed in the initial search.  *See* Dkt. No. 33.  Under these circumstances, where custodians have demonstrated an inability to recall all the records in their possession, it would not be futile to search a preexisting database that has collected all of their communications.  Indeed, it would be unreasonable not to when such a database is likely to contain any additional extant records.

some—if not all—of these subparts of LDF's requests, and the cases DOJ cites confirm it "must conduct a good faith, reasonable search *of those systems of records likely to possess requested records.*" *Cunningham*, 40 F. Supp. 3d at 83 (emphasis added).  Thus, contrary to DOJ's contention, search of the census collection database is not unreasonable but rather is required by FOIA.

Because DOJ has failed to establish the adequacy of its search for records responsive to subparts (1), (3), (4), and (5) of LDF's request, it must conduct a new search of the census collection database.  Any burden that such a search may impose can be mitigated by the methods identified above.  The Court implores the parties to work together to craft search terms "reasonably tailored to uncover documents responsive" to these subparts.  *See Brennan Ctr. for Justice*, 377 F. Supp. 3d at 434.

## IV.    CONCLUSION

In sum, DOJ has not carried its burden of showing that its search was adequate with respect to any subpart of LDF's FOIA request.  As such, its motion for summary judgment is DENIED, and LDF's cross-motion for summary judgment is GRANTED.  DOJ is hereby ORDERED to conduct an adequate search to identify documents responsive to each subpart of LDF's FOIA request.[7]

Within 21 days of the date of this Opinion and Order, the parties shall meet and confer and submit a joint letter setting out agreed-upon search terms for a search of the census collection database for records responsive to subpart (2) of LDF's request.  In that letter, the

---

[7] The Court is in receipt of LDF's January 21, 2020 letter suggesting that the census collection database's search function may be flawed, *see* Dkt. No. 35, as well as DOJ's February 5, 2020 response, *see* Dkt. No. 36.  The Court expects that any such issue will be corrected before new searches of the database are conducted.

parties shall also update the Court on the status of the search of the census collection database for records responsive to subparts (1), (3), (4), and (5) of LDF's request.

The Clerk of Court is respectfully requested to enter judgment.  This resolves Dkt. Nos. 22 and 25.

SO ORDERED.


Dated: May 29, 2020
      New York, New York

_____
ALISON J. NATHAN
United States District Judge